Filed 6/22/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| ANNIE NGUYEN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LOS ANGELES,<br><br>    Defendant and Respondent. | 2d Civ. No. B340105<br>(Super. Ct. No. 22STCV39518)<br>(Los Angeles County) |

Appellant Annie Nguyen alleges that a franchise fee paid by Southern California Gas (SoCalGas) to the City of Los Angeles (City), including a surcharge paid by customers in the City, violates article XIII C of the California Constitution[1] because it is a tax that was not approved by voters. The trial court granted the City's motion for summary judgment after concluding that the franchise fee, including the surcharge, is exempt from voter approval under section 1, subdivision (e)(4) of article XIII C. Appellant contends the trial court misinterpreted the exemption

---

[1] All constitutional references are to the California Constitution.

and that genuine issues of fact remain, precluding summary judgment. We affirm.

*Contentions*

In 2022, the City and SoCalGas entered into a franchise agreement that authorizes SoCalGas, for a period of up to 21 years, to install, maintain and operate its natural gas system under City streets, transmitting and distributing natural gas to City residents.  The agreement requires SoCalGas to pay the City a franchise fee equivalent to 5.5% of SoCalGas' gross receipts from the sale of natural gas in the City.  Three and one-half percent (3.5%) of this amount is passed on to SoCalGas customers as a "surcharge."  The California Public Utilities Commission (CPUC) later approved the surcharge.

Appellant, on behalf of a putative class, contends the surcharge is an unlawful tax within the meaning of article XIII C, section 1, subdivision (e) because it was not approved by City voters.  Appellant further contends the trial court erred when it failed to apportion the franchise fee between amounts paid for SoCalGas' use of City property and other amounts attributable to the general privilege of operating its natural gas business in the City.  Finally, appellant contends the trial court erred in granting summary judgment because there are disputed issues of material fact concerning whether the fee is reasonably related to the value of the franchise and whether the amount of the fee was determined by bona fide negotiations.

*Facts*

SoCalGas provides natural gas to City residents under a franchise agreement executed in 2022.  Before the 2022 agreement, SoCalGas provided natural gas under a 1992 franchise agreement that was extended several times.  The 1992

2

agreement granted SoCalGas the right to engage in the business of providing natural gas service to City residents and to construct, operate and maintain its gas system under City streets. It also required SoCalGas to pay the City a franchise fee equal to 2% of SoCalGas' gross receipts from the sale of natural gas in the City plus a one-time payment of $6 million.

In 1998, the City adopted by ordinance a Street Damage Restoration Fee (SDRF). This fee is paid by any entity, including a utility, that makes an "excavation or cut" in City streets. It is intended to cover the cost of mitigating damage caused to the street by that activity. SoCalGas has not paid the SDRF because it was enacted after the 1992 franchise agreement took effect.

Before it began negotiations to extend SoCalGas' franchise, the City retained a financial consultant, Alvarez and Marsal (A&M), to analyze SoCalGas' franchise property within the City. A&M estimated the fair market value of the franchise itself at $2 billion to $2.6 billion. It did not provide an estimated value of the easement rights the City granted to SoCalGas. A&M also reported that gas franchise agreements in other California cities provided for franchise fees between 3% and 5% of gross receipts, not including SDRF charges. A&M's report concluded that other cities smaller than Los Angeles charged more for the use of public streets by utility franchises. The City's chief engineer estimated the City was losing between $15 million and $18 million annually as a result of SoCalGas' failure to pay the SDRF.

Negotiations between the City and SoCalGas for the renewal of the franchise agreement began several months before the last extension of the 1992 agreement was set to expire. The parties met 14 times and exchanged a dozen written proposals,

counter-proposals and responses regarding the material terms of the new agreement.

During this process, the City initially proposed an increase in the franchise fee from 2% to 4%, with SoCalGas also paying the SDRF. SoCalGas rejected that proposal, informing the City that, with the approval of the CPUC, it would pass through to ratepayers any increase in the franchise fee. The parties exchanged several proposals regarding the amount of the franchise fee and whether SoCalGas or ratepayers would ultimately pay the SDRF.

Eventually, SoCalGas proposed a franchise fee of 5%, which would include 1.5% for SDRF payments. The 3% increase in the franchise fee would be subject to approval by the CPUC and would exempt certain lower income customers. The City countered with a proposal to either increase the franchise fee to 4% plus additional payment of the SDRF, or to increase the fee to 5.5% inclusive of the SDRF. Under the latter proposal, to avoid double payments, SoCalGas would receive a credit against the franchise fee for SDRF attributable to system maintenance work while customers would pay directly for SDRF attributable to work they specifically request. SoCalGas agreed to increase the franchise fee to 5.5%, with 3.5% passed on to customers as a surcharge after CPUC approval. The City accepted that proposal.

The final agreement, adopted by City as Ordinance No. 187354, authorized SoCalGas, "(a) To install, construct, replace, reconstruct, repair and retain in City Streets its Gas System; (b) To maintain and operate said Gas System; (c) To engage in the business of the transmission and distribution of gas within the [City]." It specified that the franchise fee was "compensation . . .

4

for (i) the rights and privileges granted by this Franchise, and (ii) the right and privilege of using, opening and excavating within the Streets of the City by [SoCalGas] in the course of installing, maintaining or removing Franchise Property and equipment pursuant to this Franchise. . . ."

The fee SoCalGas is required to pay the City is, "five and one-half percent (5.5%) of the Economic Value of the Franchise . . . ." It defined the Economic Value of the Franchise as the, "receipts and other revenues of [SoCalGas] arising from the use, operation or possession of the Franchise . . . . For any franchise payments covered by a surcharge, the Economic Value of the Franchise shall be equal to the gross receipts of [SoCalGas] derived from the rendition of service to all consumers . . . within the service area . . . ." The agreement defined gross receipts as SoCalGas' "receipts from selling, transmitting and distributing gas within the service area covered by this Franchise, or providing other services within the City."

With respect to the surcharge, the franchise agreement permitted SoCalGas, "upon CPUC approval, to designate three and one-half percent (3.5%) of the five and one-half percent [(5.5%)] Franchise payment as a surcharge to [SoCalGas'] customers with points of service within the area covered by this Franchise."

In a report for the City council, the City's administrative officer estimated the surcharge would increase the monthly bill of a typical single-family residential customer by $1.78 per month. The City's Board of Public Works approved the franchise agreement and referred it to the City council. Thereafter, the City requested bids for the gas pipeline franchise. SoCalGas

5

submitted the only bid.  After the bid period closed, the City council considered and approved SoCalGas' bid.

The City and SoCalGas exchanged additional drafts of the franchise agreement and held six more meetings to finalize its terms.  In January 2022, the City council adopted the franchise agreement via Ordinance No. 187354.  About three months later, after public meetings, the CPUC approved the surcharge.  The franchise agreement took effect in May 2022.  This litigation followed seven months later.

*Procedural Posture*

The trial court granted the City's motion for summary judgment, concluding there were no triable issues of fact and that the franchise fee is not a tax within the meaning of article XIII C, section 1, subdivision (e)(4).  It further concluded there were no disputed issues of material fact and that the franchise fee was reasonable in relation to the value of the franchise.

*Standard of Review*

We review de novo the trial court's decision to grant summary judgment, independently reviewing the record to determine whether triable issues of material fact exist. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768-769.) In doing so, we view the evidence in the light most favorable to the losing party, "liberally construing her evidentiary submission while strictly scrutinizing defendant['s] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor."  (*Ibid.*)  We review questions of constitutional and statutory interpretation de novo.  (*Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 804.) "Whether a charge is a tax or a fee 'is a question of law for the appellate courts to decide on independent review of the facts.'"

(*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 267 (*Jacks*).)

*Discussion*

Appellant contends the surcharge constitutes an unlawful tax because it was not approved by City voters and does not fall within any of the exemptions to voter approval provided in article XIII C, section 1, subdivision (e) of the California Constitution. This provision, adopted by voters in 2010 as Proposition 26, defines the term "tax" as "any levy, charge, or exaction of any kind imposed by a local government," with seven exemptions. Exemption 4, at issue here, provides that "tax," does not include, "A charge imposed for entrance to or use of local government property, or the purchase, rental, or lease of local government property." (Art. XIII C, § 1, subd. (e)(4) (hereafter, Exemption 4).)

Proposition 26 is one of a series of voter initiative measures that constrain the ability of local governments to tax. As our Supreme Court explained in *Zolly v. City of Oakland* (2022) 13 Cal.5th 780 (*Zolly II*), the first of these initiatives was Proposition 13, adopted in 1978. "Proposition 13 required the imposition of any 'special taxes' to be approved by two-thirds of the qualified electors of the city, council or special district. (Art. XIII A, § 4.)" (*Zolly II, supra,* at p. 785.) It did not, however, define "special taxes." (*Ibid.*) *City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, "construe[d] the term 'special taxes' . . . to mean taxes which are levied for a specific purpose . . . ." (*Id.* at p. 57.)

Voters amended the Constitution's voter approval requirements for local revenue-raising measures by adopting Proposition 218 in 1996. (*Zolly II, supra,* 13 Cal.5th at p. 785.) As relevant here, Proposition 218 added article XIII C to the

Constitution, providing that "[a]ll taxes imposed by any local government shall be deemed to be either general taxes or special taxes." (Art. XIII C, § 2, subd. (a).) General taxes must be approved by a majority vote at a general election, while special taxes must be approved by a two-thirds vote. (*Id.,* subds. (b), (d).)

"Proposition 218 did not define what constitutes a 'tax.' The electorate addressed that issue in 2010 with the enactment of Proposition 26. [Citation.] This measure amended article XIII C to provide that a ' "tax" means any levy, charge, or exaction of any kind imposed by a local government.' ([A]rt. XIII C, § 1, subd. (e).) This general definition is qualified by seven exemptions[.]" (*Zolly II, supra,* 13 Cal.5th at p. 785.) Section 1 of article XIII C then states that the local government bears the burden to prove, "by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (*Id.,* subd. (e).)

"A franchise to use public streets or rights-of-way is a form of property [citation], and a franchise fee is the purchase price of the franchise. [Citation.] Historically, franchise fees have not been considered taxes." (*Jacks, supra,* 3 Cal.5th at p. 262.) The *Jacks* court considered whether a fee paid by an electric utility for the privilege of using city property to deliver electricity was a tax requiring voter approval. The court concluded, "the right to use public streets or rights-of-way is a property interest, and Proposition 218 does not limit the authority of government to sell or lease its property and spend the compensation it receives for

8

whatever purposes it chooses. Therefore, charges that constitute compensation for the use of government property are not subject to Proposition 218's voter approval requirements." (*Id.* at p. 254.) Because the fee at issue in *Jacks* was imposed prior to the enactment of Proposition 26, the court did not consider whether it qualified under Exemption 4 as a charge imposed for the use of local government property. (Art. XIII C, § 1, subd. (e)(4); *Jacks, supra,* at pp. 255, 263, fn. 6.)

*Zolly II, supra,* 13 Cal.5th 780, involved contracts granted by the City of Oakland to private waste haulers, giving them the right to use public streets and other public areas to provide waste collection services in the City. The court considered whether fees paid by the waste haulers were taxes under Proposition 26 or qualified for Exemption 4. Although the court acknowledged that a "franchise fee is not per se a tax," it held the fees charged to the waste haulers met the constitutional definition of a tax because they were a " 'levy, charge or exaction,' " that was " 'imposed by' " the City. (*Zolly II, supra,* at pp. 788, 791.)

*Zolly II* then concluded that the franchise itself was not " 'local government property' " within the meaning of Exemption 4. "[T]he term 'local government property' in article XIII C seems to refer to physical objects under the control of a local government, such as its streets and rights-of-way." (*Zolly II, supra,* 13 Cal.5th at p. 793.) Other clauses in article XIII C use the term "property" to refer to "physical land, objects, or equipment . . . not property interests in such objects." (*Zolly II, supra,* at p. 793.) In addition, "Because a franchise 'becomes property in the legal sense of the word' only '[w]hen granted' to a franchise holder [citation], it cannot be said to be property belonging to the local government before the grant occurs." (*Id.* at p. 794.)

9

Finally, the court concluded the City had not "demonstrated as a matter of law that the payors paid the challenged fees in exchange for a specific use of government property that they would not have enjoyed had they not paid the fee." (*Zolly II, supra,* 13 Cal.5th at p. 794.)  The waste haulers were charged a fee to use city streets and other public places to collect trash.  The city had not, the court concluded, "established that this 'use' means anything more than the generally available prerogative to drive on public roads and rights-of-way." (*Id.* at p. 795.)  Because this factual question had not been resolved, the court held the trial court erred in sustaining the City's demurrer. (*Id.* at p. 796.)

*Zolly II* contrasted the fees paid by waste haulers with those paid by the electric utility in *Jacks*.  As the *Zolly* court explained, "Exemption 4's 'imposed for' language applies naturally to traditional types of entrance and user fees for local government property. . . .  Specific kinds of franchise fees may also meet this requirement.  In *Jacks*, for example, the utility had obtained a right to 'construct and use equipment along, over, and under' public roadways to facilitate the distribution of electricity. [Citation.]  By paying the franchise fee, the utility there had gained a specific 'use of local government property' beyond what was otherwise available to the public (i.e., an easement to install equipment)." (*Zolly II, supra,* 13 Cal.5th at p. 795.)

Appellant contends that here, the trial court erred when it found the entire franchise fee paid by SoCalGas qualified for Exemption 4 because the fee allows SoCalGas both access to physical property and the right to operate its business in the City.  Under *Zolly II*, appellant contends, Exemption 4 applies only to fees that grant access to physical property.  Here, the

10

franchise agreement grants SoCalGas access to physical property and the right to engage in the business of transmitting and distributing natural gas in the City.  The right to engage in business is, appellants contend, an intangible property right.  Since Exemption 4 applies only to fees associated with the use of tangible property, appellant contends, fees associated with the grant of intangible property rights are not entitled to the exemption and should be treated as taxes.  The franchise fee should be apportioned between the two classes of property, with voter approval required for any portion of the surcharge attributable to the City's grant of intangible property rights to SoCalGas.

The City contends apportionment is not required because the purpose of the franchise is to grant the utility access to City property so that it can provide utility services to the public.  A franchise to access public property for the purpose of installing and maintaining a natural gas delivery system would have no value if it did not also include the right to operate that system.  The two are indivisible.

We agree with City.  To begin with, SoCalGas paid the franchise fee in exchange for use of and access to specific City property beyond what would otherwise be available to the public.  SoCalGas pays for the right to "install, construct, and repair its natural gas system in City streets," a right that other City residents do not have.  Like the fee at issue in *Jacks*, the franchise fee here qualifies under Exemption 4 as a charge for the use of local government property.  It is therefore not a tax requiring voter approval.  (*Jacks, supra,* 3 Cal.5th at pp. 267-268; see also *Mahon v. City of San Diego* (2020) 57 Cal.App.5th 681, 719-720 (*Mahon*) [fee, including surcharge for the

11

undergrounding of electrical equipment, paid by utility "in *exchange* for franchise rights is not a tax . . .").)

Second, neither *Zolly II* nor *Jacks* requires the franchise fee be apportioned between amounts attributable to the installation and maintenance of the natural gas system and charges attributable to the right to operate that system.  The court in *Mahon* expressly declined to make a similar apportionment between franchise fees paid for the use of public property and "other *consideration*" paid "to induce a municipality to enter into a franchise agreement . . . ."  (*Mahon, supra,* 57 Cal.App.5th at p. 707.)  As the *Mahon* court explained, "[T]he central rationale of *Jacks* strongly supports the conclusion that *any* charge that serves as 'consideration to induce' the granting of a franchise also constitutes 'compensation' as that term is used in *Jacks*. [Citation.] That is because . . . *Jacks*, at its core, is premised on the idea that consideration promised in *exchange* for franchise rights is *not* a tax. . . .  Whether labeled as consideration given to induce the granting of a franchise or as compensation for the franchise, monetary charges given in *exchange* for a franchise fit comfortably within the *Jacks* court's specification of nontax franchise fees."  (*Id.* at p. 710.)

The same reasoning applies here. SoCalGas' use of City property to construct, repair, maintain and operate its natural gas system is indistinguishable from its use of that system to distribute natural gas.  The franchise fee is paid in exchange for the entire franchise and therefore "fit[s] comfortably within the *Jacks* court's specification of nontax franchise fees."  (*Mahon, supra,* 57 Cal.App.5th at p. 710.)

Appellant contends the City had the burden to prove the amount of the franchise fee is reasonable in relation to the value

12

of the franchise.  Because disputed issues of fact remain with regard to the reasonable value of the franchise property, appellant contends the trial court erred in granting City's motion for summary judgment.  The City contends there was no error because it is not required to demonstrate a reasonable relationship between the amount of the fee and the value of the franchise.  Alternatively, the City contends, undisputed facts establish the fee is reasonable.

*Jacks* noted that, "To the extent a franchise fee exceeds any reasonable value of the franchise, the excessive portion of the fee does not come within the rationale that justifies the imposition of fees without voter approval.  Therefore, the excessive portion is a tax." (*Jacks, supra,* 3 Cal.5th at p. 269.)  *Zolly II* did not reach the question whether Proposition 26 requires a franchise fee to be reasonably related to the value of the franchise for the fee to be exempt.  (*Zolly II, supra,* 13 Cal.5th at p. 796.)

Courts of appeal are split on the question. *Zolly v. City of Oakland* (2020) 47 Cal.App.5th 73 (*Zolly I*) held, "[A] franchise fee, arguably subject to [Exemption 4] must still be reasonably related to the value of the franchise.  [Citation.]  Only that portion with a reasonable relationship may be exempt from the 'tax' definition." (*Id.* at p. 88.)  *Howard Jarvis Taxpayers Assn. v. Bay Area Toll Authority* (2020) 51 Cal.App.5th 435 (*Howard Jarvis*), holds that the analogous exemption in article XIII A, applicable to fees imposed by state government, does not require a reasonable relationship between the fee and the value of the franchise.  (*Id.* at p. 461, fn. 18.) Like the trial court, we conclude *Howard Jarvis* has the stronger analysis.

Article XIII C, section 1, subdivision (e) enumerates seven exceptions to the general rule that, "any levy, charge, or exaction

13

of any kind imposed by a local government," is a tax requiring voter approval. (*Ibid*.) The first three exemptions expressly require the charge to be "reasonable." Exemption 4, applicable here, contains no express reference to "reasonableness." The remaining three exemptions also contain no express "reasonableness" language. Subdivision (e) concludes with a statement regarding the burden of proof in litigation concerning revenue raising measures by local governments. It provides, "The local government bears the burden of proving by a preponderance of the evidence that a levy, charge or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (Art. XIII C, § 1, subd. (e).)

  *Zolly I* concluded the burden of proof section is ambiguous because it is not clear whether the provision requiring the government to prove " 'that the amount is no more than necessary to cover the reasonable costs of the governmental activity,' " applies to all seven exemptions or only to the first three that expressly refer to reasonableness. The court noted that the "intent and objective" of Proposition 26 was to "expand the definition of 'tax' to require more types of fees and charges be approved by two-thirds of the Legislature or by local voters." (*Zolly I, supra,* 47 Cal.App.5th at pp. 87-88.) In light of that voter intent, *Zolly I* concluded, "a franchise fee, arguably subject to the fourth exemption . . . must still be reasonably related to the value of the franchise. . . . Only that portion with a reasonable

14

relationship may be exempt from the 'tax' definition." (*Id.* at p. 88.)

*Howard Jarvis, supra,* considered article XIII A, the state government equivalent to article XIII C. Article XIII A includes only five exemptions to the definition of "tax;" they are identical to the first five exemptions in article XIII C. *Howard Jarvis, supra,* rejected the argument that the burden of proof provision imposed a substantive reasonableness requirement on each exemption to the definition of "tax." It reasoned, "The absence of 'reasonable cost' language in the latter exceptions, when it is present in the first three, strongly suggests the limitation does not apply where it is not stated." (*Howard Jarvis, supra,* 51 Cal.App.5th at pp. 459-460.) Imposing a reasonableness requirement on Exemption 4 through the burden of proof provision "would render the express reasonableness language in the first three exceptions surplusage." (*Id.* at p. 460.)

The court further noted that the "reasonable costs of the state activities at issue in the first three exceptions can be determined by direct reference to the benefit offered, service provided, or administrative action taken. There is no similarly self-defining reference point for determining the reasonable cost of allowing entry onto or use of state-owned property, which might include anything from obvious repairs and upkeep to myriad enhancements of the user's experience. And . . . a reasonable costs limitation makes no sense with respect to the state's sale or rental of property or determination of fines and penalties for violations of law." (*Howard Jarvis, supra,* 51 Cal.App.5th at p. 461.) For these reasons, the *Howard Jarvis* court concluded that the burden of proof provision "does not

15

impose substantive requirements in addition to those stated in" the exemptions themselves.  (*Ibid*.)

We agree with *Howard Jarvis* that Exemption 4 does not include a substantive reasonableness requirement.  The City was, therefore, not required to prove that the franchise fee bears a reasonable relationship to the value of the franchise.  However, to the extent a reasonableness requirement exists, the City carried its burden of proof on that issue.  Undisputed evidence established that the franchise fee was the product of bona fide negotiations between the City and SoCalGas.

*Jacks* noted that "The aspect of the transaction that distinguishes [a fee] from a tax is the receipt of value in exchange for the payment."  (*Jacks, supra,* 3 Cal.5th at p. 268.)  Consequently, "fees imposed in exchange for a property interest must bear a reasonable relationship to the value received from the government.  To the extent a franchise fee exceeds any reasonable value of the franchise, the excessive portion of the fee . . .  is a tax."  (*Id.* at p. 269.)  *Jacks* acknowledged that, "determining the value of a franchise may present difficulties." (*Ibid*.)  However, "Where a utility has an incentive to negotiate a lower fee, the negotiated fee may reflect the value of the franchise rights . . . .  In the absence of bona fide negotiations, . . . an agency may look to other indicia of value to establish a reasonable value of franchise rights."  (*Id.* at pp. 269-270.)

Like *Jacks, Mahon, supra,* 57 Cal.App.5th 681, considered a surcharge attached to a utility franchise agreement that pre-dated Proposition 26.  The court concluded the city had carried its burden to prove the value of the surcharge was reasonably related to the value of the franchise rights.  The City "offered extensive and undisputed evidence concerning the negotiations

surrounding" the franchise agreement and its amendment. This evidence included advice the City received from consultants regarding potential negotiation issues and evidence the City met with representatives of the utility "more than 30 times during a multiyear negotiating process." During that time, the parties exchanged numerous offers and drafts of the agreement. (*Id.* at pp. 720-721.) There was no evidence the negotiations were not undertaken in good faith. (*Ibid.*)

Here, the City offered undisputed evidence that the franchise fee and surcharge were agreed upon after bona fide, arms-length negotiations between the City and SoCalGas. Lead negotiators for both parties met at least 14 times and exchanged numerous proposals regarding the material terms of the agreement. There is no evidence the "negotiations were not undertaken in good faith." (*Mahon, supra,* 57 Cal.App.5th at p. 721.)

Appellant contends SoCalGas lacked any incentive to negotiate a lower franchise fee because any increase would be passed through to customers as a surcharge. We reject this contention for the reason stated in *Mahon.* "As is true for any business, a utility plainly has an incentive to minimize the total amount of money that its customers will be required to pay in exchange for its goods and services in order to maintain the goodwill of its customers." (*Mahon, supra,* 57 Cal.App.5th at pp. 721-722.)

Additionally, we note that SoCalGas applied for and received CPUC approval of the surcharge. This approval reflects the CPUC's finding that the surcharge is just, reasonable and nondiscriminatory. (*Jacks, supra,* 3 Cal.5th at p. 271; Pub. Util. Code, § 451.) SoCalGas had an incentive to negotiate a

17

reasonable franchise fee because the CPUC would not have approved the recovery from customers of an unreasonable fee.

For similar reasons, we reject appellant's contention that the franchise fee was not the product of bona fide negotiations because the City agreed the SDRF would be passed through to customers in the form of a surcharge. As the court explained in *Jacks,* CPUC regulations require that such fees are recovered from ratepayers in the jurisdiction imposing them, so that ratepayers outside that jurisdiction are not subsidizing others without also benefiting from the increased fee. (*Jacks, supra,* 3 Cal.5th at p. 267.) Including the SDRF surcharge within the franchise fee did not avoid CPUC scrutiny, it complied with CPUC policies. After its review, the CPUC approved the surcharge as reasonable and nondiscriminatory.

Nor does the franchise agreement allow the City to "double collect," the SDRF. The franchise agreement requires SoCalGas to pay SDRF amounts assessed by the City. But the franchise fee incorporates an estimate of the SDRF amounts SoCalGas will generate. To avoid double payment, SoCalGas receives a credit against the franchise fee for SDRF amounts attributable to its infrastructure maintenance work. SDRF amounts generated by a specific customer request are paid by that customer. This means the City collects the SDRF only once, either from an individual customer for site-specific work, or from SoCalGas for infrastructure maintenance work. The franchise fee is reduced by the amount of SDRF paid by SoCalGas, so it pays the SDRF only once. There is no double collection.

Finally, appellant contends that a comment by City Administrative Officer Matthew Szabo demonstrates the negotiations were not bona fide or in good faith. Szabo authored

18

a report to the Board of Public Works stating the SDRF would increase the "franchise payment from 4 percent (agreed upon early in the negotiation process) to 5.5 percent. . . ." The statement that the franchise payment increase was "agreed upon early in the negotiation process," however, refers to the City negotiators' internal decision to bargain for a fee of at least 4 percent. Unilateral negotiating goals do not create a factual dispute as to whether negotiations with the other party were a sham.

*Conclusion*

The trial court properly granted the City's motion for summary judgment because the franchise fee at issue here is not a tax under article XIII C, section 1, subdivision (e)(4) of the California Constitution. The judgment is affirmed. Costs to respondent.

CERTIFIED FOR PUBLICATION.


YEGAN, Acting P. J.

We concur:


BALTODANO, J.


CODY, J.

Lawrence P. Riff, Judge

Superior Court County of Los Angeles

_____

Haffner Law and Joshua H. Haffner, Alfredo Torrijos and Vahan Mikayelyan; Law Offices of Neil R. Anapol and Neil R. Anapol, for Plaintiff and Appellant.

Hydee Feldstein Soto, City Attorney, Denise C. Mills, Chief Deputy City Attorney, Kathleen A. Kenealy, Chief Asst. City Attorney, Shaun Dabby Jacobs, Supervising Asst. City Attorney, Merete Rietveld, Deputy City Attorney, for Defendant and Respondent.